88 100
113 1147

88 100
117 402

88 100
118 668
f 118 737

88 100
122 336

88 100
126 51

STILLWELL, MILLEN & COMPANY v. THE SAVANNAH
GROCERY COMPANY et al.

1. In so far as the petition in this case rests on the insolvent
traders' act or on the assignment act, it is unsupported by the
facts in evidence. Granting that the evidence makes a *prima facie*
case of fraudulent conveyance by an insolvent firm of all of its
property to a single creditor, to the injury of the other creditors,
the purchasing creditor being solvent and able to respond, and
the complaining creditors being without judgments or other liens
and having no claim to the property by reason of fraud in the
creation of their demands or otherwise, no sufficient cause for an
interlocutory injunction and receiver as to this property appears.
It was certainly error to appoint a receiver unconditionally, with-
out offering the purchaser the alternative of giving bond and
security in lieu of surrendering the property to a receiver.
2. The case of *DeLacy* v. *Hurst*, 83 *Ga.* 223, rules nothing as to inter-
locutory injunctions or receivers. The uniformity procedure act
of 1887 does not make extraordinary remedies applicable or avail-
able where they were not so before.

November 23, 1891.

Insolvent traders. Injunction and receiver. Debtor
and creditor. Practice. Before Judge ROBERTS. Mont-
gomery county. At chambers, June 1, 1891.

The Savannah Grocery Company *et al.*, creditors of
Peacock, Peterson & Company, filed their petition in the
nature of a general creditor's bill, alleging: They are
creditors of the firm named, composed of G. W. Pea-
cock and of W. M. and C. R. Peterson, who are merchants
and are also engaged in the saw-mill business. As such
traders and lumber manufacturers they bought from
petitioners, from time to time, goods to be used by them
in the course of their business in their store as well as
in carrying on their saw-mill, and are indebted as set
out in an exhibit. Petitioners have demanded pay-
ment of such of their debts as have matured, which
has been refused. Peacock, P. & Co. own a large
amount of real and personal property, located prin-
cipally in Montgomery county, and have enjoyed good

credit with petitioners and others, based upon the knowledge of creditors of the large amount of assets of the firm, as well as upon the good standing of its members. They did business in Savannah with Stillwell, Millen & Company as factors, who claim to be their creditors for some $10,000, and have upheld their credit in Savannah to petitioners whenever inquiry was made of them, asserting that Peacock, P. & Co. were good and solvent, and that, while they held a mortgage to secure their debt, the property upon which it was given was worth four times their debt, and in this way aided greatly Peacock, P. & Co. in obtaining credit from petitioners. On January 16, 1891, Stillwell, M. & Co. obtained a mortgage from Peacock, P. & Co. to secure a debt of $7,000 principal, with interest, due in ninety days; on March 6, 1891, another mortgage further securing the $7,000; and upon March 16, 1891, another, securing payment of a note of $5,000, payable four months after date, and dated March 6, 1891; all of which mortgages are of record. They cover all the partnership property, embracing property described in the petition, and were given subject to a mortgage for $6,000, dated November 8, 1890, to the Hawkinsville Bank & Trust Company, upon which only $2,000 principal remains due. On May 1, 1891, the three members of the firm of Peacock, P. & Co., who were in Savannah at the special instance of Stillwell, M. & Co., made a conveyance to the latter in consideration of thirteen thousand one or two hundred dollars, of which $400 was to be paid W. M. and $200 C. R. Peterson, conveying all the partnership property and assets of Peacock, P. & Co. in payment of the balance due Stillwell, M. & Co. of between $9,000 and 10,000, and the balance of the debt due the bank and trust company of about $2,000, and about $1,800 alleged to be due for labor claims at the mills of Peacock, P. & Co.; Stillwell, M. &

Co. agreeing then and there with Peacock, P. & Co. that they would pay all the claims against Peacock, P. & Co. which were liens or were for supplies or goods furnished them in their saw-mill and mercantile business, and would assist them in arranging their other indebtedness, and also agreeing that Peacock, P. & Co. should have the privilege of paying the money named in the conveyance to Stillwell, M. & Co. within a reasonable time, whereupon they would convey back the property, if that course were desired by Peacock, P. & Co.; Stillwell, M. & Co. expressly stating that they did not desire the property but only payment of their debt, and asserting that it would be in every way better for Peacock, P. & Co. to put the title in them of all the assets than to have a foreclosure of the mortgage, as the expense of the foreclosure would be very great and would amount to a breaking up in business. At the time of and immediately after the signing of the said conveyance, Stillwell advised Peacock to go home and sell out all his private property as soon as possible. On May 2d, W. M. Peterson went to Stillwell, M. & Co. and requested, in conformity with the promise made by them, that they pay the debt due by Peacock, P. & Co. to the Hilton & Dodge Lumber Co., which request Stillwell refused, alleging he would pay nothing, and claiming title and ownership to all the property conveyed in the deed of May 1st. Peterson, then finding that they would not conform to the agreement made with them, informed some of the Savannah creditors of the state of affairs, among them the Savannah Grocery Company, whereupon Deitsch, vice-president of that company, on Saturday, May 2d, went to the office of Stillwell, M. & Co. accompanied by both the Petersons, and in the name of the Savannah Grocery Company, a corporation of large means, expressly stating that the offer was on behalf of Peacock, P. & Co. and their

creditors at large, tendered Stillwell, M. & Co. the full amount of the consideration of said debt, to be paid then and there, whereupon Stillwell refused to receive the money for his firm, alleging that the property belonged to them and they would not give it up ; then W. M. Peterson increased the offer, offering to pay one thousand dollars more than the amount of the indebtedness, which Stillwell, M. & Co. refused to accept, claiming the property was theirs and they would not dispose of it. The deed referred to was a quit-claim conveyance with no inventory attached to it, and no schedule of assets made out and sworn to by Peacock, P. & Co.; so that it was not executed according to law, if intended as an assignment of all the property of Peacock, P. & Co.; and it was made to hinder and delay their creditors, such intention being known to Stillwell, M. & Co. The property mentioned in it was worth largely more than the consideration thereof, and at the lowest valuation worth double the same. The sale was not *bona fide* in payment of a debt, but there was a gross undervaluation of the property, and an element of trust therein by reason of the agreement that Stillwell, M. & Co. would pay out of the proceeds of the property certain other creditors of Peacock, P. & Co. and assist Peacock, P. & Co. in making a compromise of their other debts ; the understanding between the parties being that while the title was put in Stillwell, M. & Co., the transaction was also to benefit Peacock, P. &. Co. so as to give them a surplus out of the property, either by compromise, or by the transfer of Stillwell, M. & Co. of all the property upon the payment of the indebtedness named as consideration, by some outside party, the result being a secret trust, though the deed upon its face shows a transfer for value. Upon the ascertainment by Peacock, P. & Co. that Stillwell, M. & Co. would not carry out the scheme agreed on, Peacock, P. & Co. have refused to

give them possession of the property, have remained in possession of it and are now in possession. Peacock, P. & Co. are insolvent. Their property is of such peculiar character, machinery, saw-mills and other adjuncts of a saw-mill business, that while there might be assets more than enough to pay off all debts (and the total indebtedness will amount to nearly if not over $30,000), yet by shutting down the business, which has now occurred, there will be a large depreciation in values, and much of the property · being not yet fully paid for, the sums paid upon the same will in all likelihood be lost and may be accounted as no assets by reason of the stoppage of the business (an example being given). During the last days of April, at the suggestion of Stillwell, M. & Co., Peacock, P. & Co. sold out their merchandise stock for $2,000 to one Terrell for part cash, part being still due, so that at the special instance and request of Stillwell, M. & Co. during the week before the presentation of this petition, Peacock, P. & Co. disposed of to them and Terrell, all the assets of Peacock, P. & Co., which were charged with the payment of their debts, the whole scheme tending, with the full knowledge of Stillwell, M. & Co., to hinder, delay and defraud the creditors of Peacock, P. & Co., who were threatened by Stillwell, M. & Co. with the foreclosure of the mortgage immediately unless they signed the deed. They were loath to sign it, and stated to Stillwell, M. & Co. that they desired to have a meeting of their creditors, which Stillwell urged them not to do, and by pressure and threats induced them to convey the title as above mentioned. While Stillwell, M. & Co. may have had a valid claim for money due under their mortgages, by their conduct in colluding with Peacock, P. & Co. they are liable in law to petitioners for the full amount of their debts against Peacock, P. & Co., because they aided Peacock, P. & Co. in the disposition

and concealment of their assets as stated above, and because of this conduct have no right to any claim of lien or preference, and should not participate in any of the assets of Peacock, P. & Co. until after the claims of petitioners and the other creditors have been fully satisfied. Peacock owns valuable real estate, besides · personal property, and W. M. Peterson owns a house and lot, and the members of the firm own other property, all of which private property is chargeable with the payment of the debts of the creditors. Petitioners pray for the appointment of a receiver of all the property of the firm, including that mentioned in the conveyance to Stillwell, M. & Co., and all of the private property of each of the copartners; that Peacock, P. & Co. and the members of the firm be enjoined from disposing of any of their property, and ordered to turn it over to the receiver; that they be made to account for all money paid over to them, and concerning their alleged debt; that the deed to Stillwell, M. & Co. be decreed void and cancelled; that petitioners have judgment for their several claims against Peacock, P. & Co., and also against Stillwell, M. & Co.; for process, etc.

Stillwell, Millen & Co. answered : They and their predecessors in business have had dealings with Peacock, Peterson & Co. and the predecessors of that firm for about ten years, making them large advances secured by mortgages executed from time to time and always duly and promptly recorded. Attached is a statement showing the indebtedness at various times covering the period from April 16, 1887, to May 1, 1891. On October 7, 1890, this indebtedness was $4,175, and on that day Peacock & Peterson represented to these defendants that their total indebtedness, including what they owed these defendants, amounted to but $11,500, and that if these defendants would make additional advances up to that amount, they would be enabled to pay off their en-

tire indebtedness, leaving these defendants as their only creditor. Defendants agreed to do this, and the mortgage and notes for $11,500 were duly executed by W. M. Peterson for himself and for the firm, and were taken by him for the purpose of having Peacock execute them. Afterwards, however, Peacock & Peterson stated that they had concluded not to borrow the additional amounts needed from these defendants, and were about to negotiate a loan with the Hawkinsville Bank & Trust Company. During November, 1890, this indebtedness was reduced to about $2,500 and remained at about that figure until January 16, 1891, when Peacock & Peterson applied for an additional advance of about $4,500, at that time assuring defendants that outside of their indebtedness to them and the bank and trust company they owed only $6,000, and that if the additional credit of $4,500 was given them, it would enable them to pay off all this outside indebtedness, except a few minor and unimportant matters which were not pressing, and that these as well as the bank and trust company notes they could and would provide for out of the regular and current earnings of their business. Relying upon these statements, these defendants agreed to make the additional advances, and Peacock, P. & Co. (C. R. Peterson having in the meantime been admitted to the firm) executed to these defendants a mortgage to secure the sum of $7,000. About March 6, 1891, Peacock, P. & Co. informed them that they would not be able to meet the notes held by the bank and trust company as they had anticipated, and if these defendants would give them further credit of $5,000, they would be enabled with these additional advances to take up said notes as they fell due, and then assured defendants that outside of the indebtedness to them and the bank and trust company they owed only a few thousand dollars, no neof which was pressing, and they

could readily pay off all of it from their regular earnings.    Relying upon these statements, defendants agreed to make this additional advance, and Peacock, P. & Co. executed another mortgage to secure it, including in it all the property embraced in the mortgage for $7,000 and other property, and at the same time executed a new mortgage as additional security for the indebtedness of $7,000, covering the additional property not embraced in the prior mortgage for that amount, it being then and always previously distinctly understood and agreed that the mortgages given by the firm to secure their indebtedness to defendants should cover all of their property.    These defendants at that time believed that the property embraced in the mortgages much exceeded in value the indebtedness to them, else they would not have agreed to make any additional advances. It was distinctly agreed that the indebtedness of Peacock, P. & Co. to them should not exceed $12,000, and that this should include the amount due the bank and trust company, whose mortgage was prior to those held by defendants and whose notes were to be paid with the advances thus to be made by them. . It was distinctly agreed that Peacock, P. & Co. would pay their labor account and meet the notes of the bank and trust company, that no further advances beyond the $12,000 so secured would be required by them or would be made by these defendants, and that Peacock, P. & Co. would pay off their small outside indebtedness out of their regular earnings.    On April 10, 1891, Peacock, P. & Co. obtained from defendants $500 to pay laborers, representing that that was all they owed for labor.    Later in the month they presented a statement showing they owed a further amount of about $1,000 for labor, which statement was sworn to by them as correct and as being all they then owed for labor.    These defendants sent a representative for the purpose of paying off this labor

account, but Peacock, P. & Co. declined to allow this to be done. Defendants then ascertained that this statement was incomplete and that there was more due for labor than appeared thereon, and sent for Peacock, P. & Co., who, in response to their request, came to Savannah, and defendants then ascertained that they really owed for labor about $2,000, and that the amounts thus due for labor, with the notes held by the bank and trust company for which Peacock, P. & Co. were not providing as they had agreed to do, would make their indebtedness to defendants considerably exceed $12,000, if said labor account and notes were paid by defendants. During the month of April they ascertained that the indebtedness of Peacock, P. & Co. was very much greater than they had represented it to be, that they owed a great deal more on their timber leases than they had represented, and that therefore the property covered by the mortgage of these defendants was not nearly so valuable as Peacock, P. & Co. stated it to be. They also learned that said firm had been purchasing costly machinery and other things not warranted by their business and for which they could not reasonably expect to pay. Accordingly, when they came to Savannah about May 1st, defendants informed them they could not make any further advances, and, one of the mortgages being over due, that they would be compelled to foreclose it. The matter was discussed, and finally it was agreed that Peacock, P. & Co. should make an absolute deed to Stillwell, M. & Co. of all their property in satisfaction of their indebtedness to Stillwell, M. & Co., who at the time stated to Peacock, P. & Co. that they did not desire the property but would much prefer the money, and would take $1,000 off their account in order to get a money settlement; but Peacock, P. & Co. stated that they were unable to do this and had reached the point where they could not go on with their busi-

ness, and agreed to execute the deed as the best and only settlement they could make. There were no conditions, reservations or understanding with reference to the deed, but it was understood that it was, as it purports to be, absolute and unconditional. The consideration named in it, $13,265, was thus arrived at: The indebtedness of Peacock, P. & Co. was estimated and fixed at $10,500. At that time they were entitled to credit for lumber sold for their account, of which measurements had not been received, so that it was impossible then to state with certainty what this credit should be. There were also freight-bills which had not then been received, for shipments of lumber embraced in previous accountings. Defendants knew the indebtedness would reach at least $10,500, but have since ascertained that it was really about $100 more. The labor account was agreed to be $2,000, and this had to be estimated because, in addition to the itemized statement presented by Peacock, P. & Co., there were amounts on loose memoranda which they stated had to be added, and the statement and memoranda showed the labor account to be about $2,000. There was also a mortgage upon the house and lot of W. M. Peterson, upon which there was due, as defendants were then informed, $400, which had been given by him, as they were informed, to secure a loan with which to pay the amount due on account of an engine bought by the firm. There was also $165 due for an engine and $200 due for timber. These sums made the consideration mentioned in the deed. After this amount was fixed and the purchase agreed on, defendants also promised to pay a bill for food for mules amounting to $100. There was no agreement or understanding of any kind that defendants were to pay or would assume any of the debts of Peacock, P. & Co., except those which made up the consideration of the deed and the debt of $100 last mentioned.

They knew that the deed was subject to the mortgage of the bank and trust company, and that it was subject to the claims for labor of which they then had actual notice, these labor claims, however, being included in said consideration; and also knew that if they desired to take any of the timber mentioned in the timber leases which had then not been furnished and paid for, they would be compelled to provide for its payment, where title remained in the vendor or lessor. There were also a few liens which are specifically mentioned in the mortgages held by these defendants, and they understood their deed was subject to these and they would have to satisfy these if they desired to hold the property covered by them, but were under no obligation to take any property which was subject to specific and prior liens unless they saw fit, and this was thoroughly understood. The deed was executed May 1st. On the evening of May 2d, Deitsch came to their office with both of the Petersons and stated that they had informed him that Stillwell had promised he would cancel the deed whenever the indebtedness of Peacock, P. & Co. to these defendants was paid, and he inquired of Stillwell whether this was true. Stillwell replied that the statement was not true, that the deed was an absolute deed, and if proposals to purchase the property were made he would consult the other parties who were interested. At this point W. M. Peterson asked whether, if $500 were added to the amount, these defendants would cancel the deed, to which Stillwell replied, "The deed is absolute, and we will not talk about cancelling." Deitsch then rejoined that that was all right, that he only came to verify the statement of the Petersons, that he understood it now, that the deed was an absolute one to these defendants and that settled it. As they were going off, Stillwell called back the Petersons and stated that while he could not admit the right of any one to

have the deed cancelled, it being absolute, he did not
desire to keep the property but wished to sell it, and if
Peacock, P. & Co. or Deitsch or the creditors or any one
offered the money, he would quickly close with the offer,
and was willing to sell to any one who would pay these
defendants the consideration of the deed. He also called
to the attention of the Petersons that Deitsch had made
no offer of any kind, and that he did not believe Deitsch
was authorized to do so, being under the impression
that the president of the grocery company was absent,
and he did not think that Deitsch had then conferred
with the creditors, or that he had authority to make any
offer.   Stillwell then and there distinctly stated that any
one who desired the property could get it for what these
defendants gave for it.   On the evening of Saturday,
May 2d, these defendants sent a representative of their
firm to receive possession of the property under their
deed, and they are informed that the possession was act-
ually and duly delivered to him.   On Monday they re-
ceived a telegram from him that, during the day and
after the possession had been delivered to him, Deitsch
arrived and at once busied himself with efforts to im-
pede and embarrass their control and management of
the property.   They learned that Deitsch had advised
the laborers not to work for them nor to receive any
money from them, and had prevented their representa-
tive from getting the pay-roll and paying off the la-
borers.   They had forwarded by express the requisite
money, over $1,800, to pay off the laborers, having paid
at Savannah the balance of the labor account, and their
representative was unable to use the money for this pur-
pose because of Deitsch's interference, and finally it was
returned to them.   They are informed that by various
contrivances Deitsch managed to add seriously to the
demoralization that already existed among the laborers,
and obstructed and embarrassed, in every way his craft

and cunning could suggest, the agents and employees of these defendants in their control and operation of the property. All this was done by Deitsch without the slightest warrant or authority, or intimation on his part that would lead them to suspect he contemplated any such proceedings. On the contrary, his observations, tone and bearing at his interview with Stillwell above mentioned, were such as to lead them to believe he was entirely satisfied they had made an absolute purchase of the property, and that he had no intention of questioning the transaction. On May 6th, Myers, the president of the grocery company, asked Stillwell if he would be willing to sell the property conveyed for the consideration mentioned in the deed, and Stillwell replied he would to any one who would pay these defendants the amount they gave for the property. Myers then stated he had been informed that the indebtedness of Peacock, P. & Co. was not as much as the amount named as the consideration of the deed, and Stillwell replied that that was true, that the consideration not only included the actual indebtedness of Peacock, P. &. Co. which then amounted to about $10,500, but also included certain amounts for labor, etc. which these defendants had agreed to pay, and that if the amount which represented the indebtedness of Peacock, P. & Co. on May 1st were paid, he would be willing to make a quit-claim deed to the property, provided the purchaser would assume these additional amounts which were included in the consideration. To this Myers replied that that was all right, that the creditors were then endeavoring to arrange the matter and he thought they would purchase the property from these defendants upon these terms. On the next day Myers again called and stated to Stillwell that the matter was progressing favorably, and that the creditors expected to purchase the property from these defendants upon the terms stated and he thought the

matter would soon be adjusted upon this basis. Later during the day one who was representing Peacock, P. & Co., and was advising with their creditors, called at the office of these defendants and stated that he was sent by the creditors and by their attorneys to advise these defendants that the arrangements were progressing very favorably and that they expected on the following Saturday, May 9, to close the matter and purchase the property by paying these defendants the consideration of their deed, and he stated further that W. M. Peterson had been sent to Montgomery county to get certain papers, and that on Saturday morning the creditors expected to finally adjust the matter. On Saturday morning, instead of the adjustment promised and which these defendants in entire reliance upon the good faith of the creditors were awaiting, they were served by the attorney of the creditors with a telegram from Judge Roberts, which stated that a restraining order on the creditors' petition had been granted by him at eight o'clock a. m. that day, and a temporary receiver appointed, etc. These defendants at once endeavored to get further information than that conveyed by the telegram, with reference to the character and effect of the proceeding, and sought to procure a copy of the petition, but were unable to obtain the information or procure a copy until the following Monday, and then read with amazement its allegations and observed that it had been sworn to by Doitsch on May 8th, at a time when the negotiations for a friendly adjustment were still pending. It is not true, as stated in the petition, that Peacock. P. & Co. were, when the petition was filed, merchants or traders, but they had entirely ceased to do business, are not now traders and have not been since May 1st, and on May 1st the firm was actually dissolved by written agreement. On several occasions inquiries have been made of Stillwell with reference to Peacock, P. & Co. The particu-

lar circumstances attending each inquiry or the persons making them these defendants cannot state, but they have on each occasion answered them fairly and frankly, giving the facts as they understood them. They have informed the inquirers of their mortgages upon all the property of Peacock, P. & Co., and with reference to the value of the property or any other matter have given the information they had received from Peacock, P. & Co., stating expressly that their statements were based upon the information thus received from Peacock, P. & Co. They could have had no possible motive to uphold the credit of Peacock, P. & Co.; they were always, as they thought, fully secured by promptly recorded mortgages ; and they have no recollection of ever having stated that the property covered by their mortgages was worth four times the indebtedness to them, but there are times when this statement might have been made because there are times when it was true. It is not true that $700 of the consideration named in the deed was to be paid W. M. Peterson. In the statement of the account for labor there was included $200 due C. R. Peterson for labor by the old firm before C. R. was admitted into the firm. It is not true that they agreed with Peacock, P. & Co. to pay all the claims against that firm which were liens, or were for supplies or goods furnished them in the saw-mill or mercantile business ; nor that they agreed to assist them in arranging their other indebtedness; nor that they agreed with Peacock, P. & Co. that they were to have the privilege of paying the sum named in the conveyance to these defendants within a reasonable time after the signing of the deed, and that they would convey back the property if that course were desired by Peacock, P. & Co. It is true these defendants stated, before the settlement was made, that they did not desire the property but only the payment of their debt. It is untrue that Stillwell ad-

vised Peacock to go home and sell out all his private property as soon as possible. It is untrue that W. M. Peterson requested them to pay the debt mentioned in the petition, and if the request had been made it would have been refused, for they had not assumed the payment of this debt, but it was distinctly understood they would not assume the payment of any of the debts except those included in the consideration of the deed and the small bill of $100 mentioned. It is not true that on May 2d, Deitsch tendered these defendants the full amount of the consideration of the deed, stating that the offer was made on behalf of Peacock, P. & Co. and the creditors at large, nor that Stillwell refused to receive the money or stated that they would not dispose of the property. No tender has ever been made them, but on the contrary, Deitsch, Myers, and the other petitioners know that they could now get and could at any time have got a quit-claim deed to the property from these defendants by paying the consideration of the deed to them, or by paying the actual indebtedness of Peacock, P. & Co. to them on May 1st, and assuming the other amounts assumed by defendants and included in the consideration. The deed was not made to hinder and delay the creditors, nor was such intention known to these defendants. The property was not worth largely more than the consideration named in the deed. The sale was *bona fide* in payment of a debt, and there was not a gross undervaluation of the property. The statement that there was an element of trust in the deed, etc. is false, as is the statement that there was an understanding between the parties that, while the title was put in these defendants, the transaction was also to benefit Peacock, P. & Co. so as to give them a surplus out of the property, etc. All the statements and suggestions of the petition which in any way impeach the *bona fides* of the deed, or charge these defendants with

fraud or with participation in fraud, are infamous false-
hoods. It is not true that Peacock, P. & Co. refused to
give possession of the property to these defendants, or
were in possession of it at the time the petition was filed;
but possession was duly delivered by them to the repre-
sentative of these defendants on Monday, May 4th.
These defendants, after their purchase and the execution
of the deed, agreed to employ the Petersons at Verbena
at salaries of $75 per month, W. M. until January 1st,
and C. R. as long as it was mutually satisfactory; these
defendants intending to operate the Verbena mill and
the Petersons being familiar with the property and busi-
ness at that point and being then without other employ-
ment. At once upon turning over the property to
defendants' representative, the Petersons went regularly
to work under him, faithfully performing their duties as
directed by him. They and the other employees were
proceeding harmoniously under the supervision of the
representative until the advent of Deitsch, who suc-
ceeded, by inducements and chicanery of various kinds,
in dissatisfying W. M. Peterson and in alienating him
from the employment he had undertaken with these
defendants. The possession of the property, however,
remained with these defendants until they turned it
over to the receiver under the order of Judge ROBERTS
on May 11th, the receiver giving their representative his
receipt for the property; up to that time they were in
the full possession and control of the property. It is
true that by the shutting down of the business, which
has now occurred, there will be a large depreciation in
value, and as the result of the granting of the injunction
and receivership these defendants have already incurred
large damages which are being daily augmented. It is
untrue that Peacock, P. & Co. sold out their merchandise
stock to Terrell at the suggestion or special instance and
request of these defendants, for these defendants did

not know of the sale until after it was effected. It is true these defendants have advised Peacock, P. & Co. it was not good business policy to run a merchandise store in connection with their saw-mill business, that this had been their experience, and that in consequence in their own business they had for some time discontinued such a practice. They have no recollection of having any conversation with Peacock, P. & Co. at all upon the subject, within a month or so prior to May 1st, and their advice, as given previously, was only with reference to the inexpediency generally of attempting to run a store and saw-mill at the same time. It is untrue that Peacock, P. & Co. were loath to sign the deed, or that they stated they desired to have a meeting of their creditors, or that Stillwell urged them not to do so and by pressure and threats prevailed upon and induced them to execute the deed. The matter was fully and carefully considered by Peacock, P. & Co. and fully discussed by them with Stillwell representing his firm, and the deed was executed by them freely and voluntarily, and no improper influences of any kind were attempted or thought of. These defendants accepted the deed in entire good faith in satisfaction of the indebtedness to them, which, as well as the mortgages securing it, was unquestioned. Far from any desire to take advantage of their debtors or the other creditors in receiving the deed, these defendants preferred to have a settlement at a loss to them of $1,000, rather than take the property in satisfaction of their debt. It is difficult to say what the market value of the property is, the prices of lumber having greatly fallen since January 1st and all kinds of saw-mill property having greatly depreciated in value. It is untrue that they colluded with Peacock, P. & Co. to hinder and delay the creditors, or aided and assisted them in the disposition and concealment of their assets in fraud of the rights of creditors. These defendants

have been engaged in business in Savannah for many years, are possessed of large capital and are amply able to respond to all claims against them. The actual expenses now accruing and which will continue to accrue while this injunction and receivership are continued, on account of the care and preservation of the large amount of property which remains idle and unemployed, are very great, and probably $50 a day would be a moderate estimate of the actual daily expenses. The property is just of the character that depreciates rapidly by reason of non-use; the machinery deteriorates; the logs, if there be any in the woods, will be destroyed by the worms, and the property generally will necessarily suffer great injury from remaining unused and idle. Besides all this, the labor will become demoralized and scattered. There have been employed about seventy-five laborers about the mill at Verbena, who are in a state of demoralization, threatening serious trouble. These have not been paid off for some time, despite the willingness of these defendants to pay them off. Many of them are skilled and familiar with the work and especially familiar with this mill, and it will be exceedingly difficult and expensive to supply their places. A large element in the value of property of this kind is dependent upon its continuous use and employment. While it is impossible now to calculate exactly what the damages will be that will result from a continuance of the injunction and receivership, they will be very large, and such continuance must result most disastrously.

At the hearing the testimony for the petitioners was substantially as follows: The allegations of the petition are true. On several occasions one of petitioners avoided selling Peacock, P. & Co. any supplies, but finally on being referred to Stillwell, inquired of him regarding the financial standing of Peacock, P. & Co. during January, 1891, to which inquiry he replied that Peacock, P. & Co.

had been cramped during the fall of 1890 by large timber purchases but were now in easier condition and in a position to make money, and that they had valuable property and he considered them good for their contracts; and upon this statement were sold some of the bills due petitioners by Peacock, P. & Co. Another of petitioners did business with Peacock, P. & Co. and their predecessors for a number of years, and when late payments began to be slow, made inquiry of Stillwell as to their financial standing; whereupon he was informed by Stillwell that, while they were a little slow and business was dull, he considered them amply solvent and able to meet all their debts and would have a surplus over all their debts. In March, 1891, the Savannah Grocery Co. having received from Peacock, P. & Co. an order for goods, and a draft for $400 on Stillwell, M. & Co., its president called on the latter firm, who declined to accept the draft; but Stillwell stated that he would accept it as soon as sufficient lumber was shipped, that Peacock, P. & Co. were perfectly solvent, and that the securities from them held by Stillwell, M. & Co. were worth about $35,000 to secure an indebtedness of about $10,000. On two occasions Deitsch, as vice-president of the grocery company, called at the office of Stillwell, M. & Co. to make inquiry as to the financial standing of Peacock, P. & Co., and in both instances Stillwell stated that Peacock, P. & Co. were perfectly solvent, that while Stillwell, M. & Co. were secured by mortgage, the mortgaged property was worth four to one, and that while Peacock, P. & Co. were embarrassed by the dullness of the lumber trade and by excessive land purchases, etc., Stillwell, M. & Co. considered them good for their contracts, and recommended them for credit. This statement had such weight and effect that the grocery company extended a more liberal credit to Peacock, P. & Co. than it would have done otherwise, especially as Still-

well is a stockholder and director in it; and for that reason Deitsch did not doubt the correctness of the statement, and for that reason only did his company extend credit to Peacock, P. & Co.    This firm did business with Stillwell, M. & Co. as factors, and are indebted to them about $11,000, for which they hold notes secured by mortgages on the firm property.    The mortgages were given at the earnest demand of Stillwell, he stating at the time of taking them that they would keep their creditors off, and that Stillwell, M. & Co. would renew from time to time their notes as they fell due indefinitely.    About April 24, 1891, and several times prior thereto, Peacock and C. R. Peterson went to Savannah to obtain money from their factors to pay off hands. Stillwell refused to let them have the money for pay-rolls, but sent his firm's agent, Wm. Hodgson, to the place of business of Peacock, P. & Co. to pay off the hands and take the receipts.    At first he allowed Peacock to believe that he would let them have the pay-roll money upon a certified pay-roll being made out by C. R. Peterson, but insisted that Peacock and the other members of the firm should sign a certificate to a statement made out and dated on April 24, 1891, showing a balance due by them to Stillwell, M. & Co. of $10,769.25, which Peacock refused to do.    Thereafter Stillwell, M. & Co. made strenuous efforts to get Peacock to come to Savannah, telegraphing to several points for him and instructing an agent to hunt him up.    On April 30, 1891, he heard of this, and got ready to go there at once; he and C. R. and W. M. Peterson arrived there on the 1st of May; and thus they went at the special instance of Stillwell, M. & Co.    While there, after being threatened by Stillwell that the mortgages against them would be foreclosed immediately unless they acceded to his demand to sign the deed, they were induced to sign a deed to all their partnership property, it being the

understanding and agreement of Peacock with Stillwell that Stillwell, M. & Co. were to pay off the debt of the Hawkinsville Bank & Trust Co., a balance due on a mortgage held by it, all the laborers' liens, a claim for feed furnished by Cook and McRae, and debt due the Hilton & Dodge Lumber Co., it having been.specially insisted by C. R. Peterson that he was responsible for said debt, and that he must have that debt paid.    Peacock was further led to believe by Stillwell that he or his firm would see to a settlement of their affairs, that is, come to a compromise settlement with their creditors and assist them in obtaining such settlement.    Peacock was further informed by Stillwell that he or his firm thought it would be better in every way for Peacock, P. & Co. to put the title to all their assets in Stillwell, M. & Co. than to have a foreclosure of the mortgages, as the expense of foreclosure would be very great and would break them up in business, and that it would be better in bringing about a settlement with all their general creditors.    Peacock under no circumstances would have signed any deed for all the partnership property, except with the understanding and agreement which he had in good faith made, that, if he had made any such deed and if thereafter his firm's affairs were all settled and he could discharge his firm's obligation to Stillwell, M. & Co. within a reasonable time, Stillwell, M. & Co. were to reconvey the property to Peacock, P. & Co.; Stillwell, M. & Co. expressly stating at the time that they did not desire the property, but that they wanted their debt paid.    On May 1st, at the time of the signing of the conveyance, Stillwell advised Peacock to go home and sell out his private property, real and personal, as quickly as possible, and that it would be to his best interest to do so, which came about in this way: Stillwell followed up Peacock and his partners incessantly so as to prevent them from getting into the hands of

their general creditors, they not agreeing at once to sign
the proposed deed; and Peacock asked Stillwell what
he had better do in regard to his individual property,
as he felt that the creditors would come down on
him; whereupon Stillwell told him that that was
a matter about which he had better consult Judge
Adams, his lawyer. Upon getting to the office of
Judge Adams the deed above alluded to was all
ready, and he was asked to sign, which he did not
do at once; and in asking Judge Adams respecting the
disposition of his property, Judge Adams asked him
whether there were any judgments or executions against
his firm or himself, to which he replied that there were
not; whereupon Judge Adams told him that the only
way for the transfer to be made was to make *bona fide*
sale of his individual property and for valuable consid-
eration, that he could not convey it for love and affec-
tion to his son, who was a minor. Thereafter he signed
the conveyance so prepared by the attorneys of Stillwell,
M. & Co., and it covered all the partnership assets of
Peacock, P. & Co., including all their timber privileges
and leases to timber land; and after the signing of said
deed, Stillwell again urged him to go home as soon as
possible and attend to the transfer of his individual
property so as to protect himself. He left for his home
that night. His firm sold out their stock of merchan-
dise for $2,000 to Terrell, receiving part in cash and
part in notes which have been traded off. This sale to
Terrell was urged by Stillwell both personally and by
letter; the requests so made amounted to a demand on
his part that Peacock's firm should get rid of that store,
and that they had no business to try to run it. Peacock
would never have signed the deed of May 1st, nor does
he believe any member of his firm would have signed it,
but for the agreement that the laborers' claims, the bank
and trust company balance, the claim for feed and the

debt of the Hilton & Dodge Lumber Co. would be paid by Stillwell, M. & Co., and that the other affairs would be arranged in a satisfactory manner, and upon the further agreement on his part that after the matter was settled, debts paid or compromised, Stillwell, M. & Co. without any further solicitation would, after a reasonable time, reconvey the property to his firm. He was threatened, and in consequence of such threats he signed the deed. He certainly understood then, and understands now, that the deed "was never intended as an absolute and *bona fide* deed ; that is to say it was *bona fide* in this respect : that when the matters as above stated were duly arranged, a conveyance should be made back, and that possession of all of said copartnership property both real and personal, comprising the plants and everything therewith connected, that his firm never gave to said Stillwell, Millen & Co., nor to any one authorized by them, possession of said property, and if any such possession was given, it was done without the consent and knowledge of this deponent, of said property or any part thereof." On May 6, Hodgson and Preston, who were sent by Stillwell, M. & Co. to take possession of the property, endeavored to get possession of it, and were told by Peacock that they could not get possession of it, they remarking to him, " Don't you know that we have been in possession ?" Peacock told them they never had been in possession and were never going to get possession of it. He contributed all the capital to the firm of Peacock, P. & Co., taking the Petersons in business and permitting them to manage the same ; and upon an accounting they would have but little owing to them. One of the reasons that actuated him in signing the deed was the fact that he was very anxious to see the laborers paid off, that he felt for them, having known many of them for years, and that they were all men who needed their money, and that Stillwell utterly refused to pay

any one of them or anybody else unless Peacock, P. & Co. consented to execute the deed. He threatened that if the deed was not signed the laborers would not be paid, that the bank with which the notes and mortgages had been placed had demanded payment, that unless something was done the bank insisted upon a foreclosure, that the bank demanded a certified pay-roll paid up to April 25, 1891, and that unless the same was furnished and showed on its face that it was paid, such action of foreclosure would be taken. Peacock's firm never owed Stillwell, M. & Co. $12,000; according to the statements made by Stillwell, M. & Co., it was shown that the indebtedness was about $10,500; and if they had advanced to Peacock's firm the difference between those two amounts, Peacock believes that his firm could have gone on in business. He so states from the fact that only about $900 was at the time required to pay off the laborers, and that while some few of the creditors were asking for their money, they were not being pushed by any considerable creditor. He further states, in connection with the statement in the answer concerning the running up of the amount of the pay-roll, that it was caused by the fact that when the certified pay-roll was demanded, Peacock's firm included everything that was due at that time in the pay-roll, which, for example, included $140 due Peacock's son who would not have demanded it if the business could have been carried on. Several other amounts were included in the same way. It was the full intention of Peacock, P. & Co. to pay off the Hawkinsville Bank & Trust Co., and had it not been for depression in business and tight money market, that debt would have been amply provided for. The indebtedness of the firm was no greater than it was represented to Stillwell, M. & Co. at any time. As regards the debts due on the timber leases, it must have been known to Stillwell, because all the leases, as taken from time to

time, were placed with his firm, and when they were needed in the trial of a case in the United States court, they had to be sent for by Peacock's attorneys in whose possession they are now. His firm purchased no more machinery than was needed for the proper management of their business; and they certainly expected to pay for it when they bought it. Their credit was seriously injured by the fact that when Stillwell, M. & Co. were asked to pay certain drafts drawn by them, they allowed these drafts to go to protest, and the money arising from shipments calculated to pay these drafts was applied by Stillwell, M. & Co. to the payment of notes due Waycross Lumber Co. and to the general credit of Peacock P. & Co. on their account with Stillwell, M. & Co., who were specially directed to apply the proceeds of certain shipments to the payment of said drafts, instead of which they paid off other debts; and Stillwell so admitted afterwards, and asked Peacock to sign a paper releasing Stillwell's firm from any liability in the premises. It is not true that the $200 to be paid by Stillwell, M. & Co. to C. R. Peterson was for labor due by the old firm of Peacock, & Peterson to C. R. Peterson, but it was simply to be given him as a *bonus,* and in Peacock's opinion was simply an inducement to make C. R. Peterson sign the deed; and the same is true as to the $400 to be paid off on a mortgage by Stillwell, M. & Co. to W. M. Peterson, as there was no further consideration moving between the parties. When the receiver arrived to take possession of the property pointed out by the petition in this case, he found Peacock, P. & Co. and certain representatives of Stillwell, M. & Co. at the mill at Verbena, both parties claiming to be in possession of the premises. While he gave Stillwell, M. & Co. a receipt for property of which he took possession, he did so because it was demanded by said representatives; he would have given a like receipt to Peacock, P. & Co.

if they had asked for it; it was only intended as a memorandum of what he had taken possession of. The property conveyed by the deed is worth largely in excess of $13,500, and much more than the estimate in the testimony of Stillwell, M. & Co. On May 2, Terrell came to the office of the Savannah Grocery Co. and endeavored to buy a stock of merchandise on time, stating that he had bought the mercantile interests of Peacock, P. & Co., for which he had paid part cash and part in notes, that in order to secure further supplies he could give Stillwell, M. & Co's acceptance; whereupon at Deitsch's suggestion they called at the office of Stillwell, M. & Co. to ascertain if they were willing to accept for Terrell. Stillwell informed Deitsch that Peacock, P. & Co. had sold their mercantile interests to Terrell and that he was not willing to accept for Terrell; and then Deitsch for the first time learned that Peacock, P. & Co. were in Savannah. He went and found C. R. and W. M. Peterson, Peacock having left the city. He learned in conversation with the Petersons that they had deeded their entire property to Stillwell, M. & Co. in consideration of mortgages held by the latter against the property of Peacock, P. & Co. at Verbena. The Petersons stated to him that they had insisted upon calling a creditors' meeting and laying the affairs of Peacock, P. & Co. before the creditors, but that Stillwell argued with them for over a day to induce them not to do so, saying that such meeting would cause unnecessary expense and would be of no benefit to them, and promising them to arrange their mercantile indebtedness; and then claimed that it was only by extreme force of argument that they signed the deed, C. R. Peterson especially claiming that he had refused persistently to sign it and was the last one to do so. Deitsch then called in company with them at the office of Stillwell, M. & Co. and asked Stillwell if he would accept

$13,500 or such amount as actually was due on the deed, and transfer his title to Deitsch for the benefit of all the creditors; to which Stillwell answered, "If you had made the offer before the deed was signed, I should have accepted it; but now it is a deed, and I have wired to New York to other parties, and I cannot act. I cannot accept any proposition." W. M. Peterson at the time offered $500 in addition to the $13,500, but Stillwell refused to entertain any proposition. Had he accepted the proposition made by Deitsch, Deitsch would without hesitation have acted, knowing from former dealings that he would have been sustained by other creditors, and would immediately have given the checque of the Savannah Grocery Co. for the $13,500, as he was fully authorized to do. That same evening he did confer with the two largest creditors of Peacock, P. & Co., who said that it would have been satisfactory to them had Stillwell accepted Deitsch's proposition, and they approved his action and agreed to pay their proportionate share. Two days afterwards, at a meeting attended by a majority of the creditors of Peacock, P. & Co., and by Peacock and W. M. Peterson, Peacock stated that at the very lowest estimate the property was worth more than $50,000, that the running of the mills would show a profit if continued, that their river mill had just about been got into position to run, that on account of the building of it they had been thrown behind, and that they could run said mills at an estimated net profit of $2,000 per month. All these statements were corroborated by W. M. Peterson, who further stated that when they came down at the solicitation of Stillwell against the request and desires of the other members of the firm, he signed one of the statements admitting the amount of the indebtedness of Peacock, P. & Co. to Stillwell, M. & Co. that was offered to him by Stillwell; that at the time of signing it he did not

know whether it was correct or not ; that subsequently he was prevailed upon by Stillwell to sign the papers of sale of the property under threats that if they did not do so, the sheriff would be in possession in the morning, that the papers to that effect were already prepared ; that they were in need of money to pay off their hands and other wants necessary for their mill purposes ; that nothing could be got from Stillwell, M. & Co.; that under the advice of Stillwell and his say so that it was to their best interests in every way, they were at length prevailed upon to sign the papers. W. M. Peterson also corroborated the statement of Peacock that Stillwell had advised him, after the signing of said papers, to dispose or transfer such property as he had standing in his individual name, as a safeguard. One of the creditors was informed by both W. M. and C. R. Peterson that when Stillwell, M. & Co. learned that Peacock, P. & Co. had property which was not covered by their mortgages, they called for mortgages on the property not so covered, and refused to make further advances of any kind unless such further mortgages were given. The Petersons wanted to interest the two named firms, creditors of Peacock, P. & Co., for the purpose of raising the mortgages then in the hands of Stillwell, M. & Co., in preference to giving the additional mortgages; but owing to the stringency of the times the two firms would not enter into any agreement of the kind; and afterwards the Petersons informed one of them that they had been forced to give the mortgages so as to get money for their pay-roll and food for their stock. At the creditors' meeting above mentioned, it was concluded that it might be advisable for the general creditors to purchase the property of Stillwell, M. & Co., and with that object a committee of three, one of whom was Myers, the president of the grocery company, were appointed with full power to act and bind the general creditors by their ac-

tion.  At various meetings of this committee ·Peacock
and W. M. ·Peterson repeated the facts hereinbefore
mentioned; and the committee learned in addition that
there were some considerations given or to be given
to the Petersons by Stillwell for Stillwell, M. & Co., and
this fact was further brought out by the statement ren-
dered by Stillwell, M. & Co. which was handed to the
committee, showing the sum of $200 to C. R. and $400
to W. M. Peterson.  At one time the matter of pur-
chase was about settled upon, when, from facts brought
out by interviews of the committee with W. M. Peter-
son and Peacock, the committee came to the conclusion
that there was some collusion between Stillwell, M. &
Co. and Peacock, P. & Co., that the sale was not *bona
fide*, and that while Stillwell, M. & Co. might have a
valid claim on a proper accounting, they had by their
conduct· aided Peacock, P. & Co. to dispose of their prop-
erty in fraud of their creditors; and therefore the com-
mittee concluded to break off negotiations and to pro-
tect the interests of the general · creditors.  Then, and
not before, were the attorneys instructed to proceed in
the preparation of the petition.  On May 6, two of the
committee called on Stillwell to ascertain what price he
would take for the property in question, and without
going into details Stillwell stated that he would take
$13,265, would give no option but would feel privileged
to sell to any one else if he got a good offer.  In the
course of the conversation he mentioned that when
Deitsch saw him on May 2, he was not in a position to
accept his offer because there were other parties inter-
ested, but since that interview he had heard from these
parties and they were willing to accept and sell out the
property provided they got the above amount.  On the
next day Peterson stated that Peacock, P. & Co. were
still in possession of the property, that Stillwell, M. &
Co. were not in possession, and that possession had been

v 88-9

refused to them.    On May 19, C. R. Peterson admitted to one of petitioners that the statements made by him in an affidavit he had made for Stillwell, M. & Co. were susceptible of explanation, and if such explanation were made by him it would change the entire tenor of said affidavit.    W. M. Peterson made a like admission as to an affidavit he had made at the same time.    He said that the best part of his knowledge of this transaction had been left unsaid, and what had been left unsaid would counteract fully the strength of his affidavit.    At the creditors' meeting above mentioned, Peacock and W. M. Peterson stated that under the advice and threats of Stillwell they disposed of their store and stock of goods to Terrell, Stillwell stating that it was not a necessary adjunct to the mill and conflicted with the mill business. The firm of Peacock, P. & Co. collectively stated that when the pressure was first brought against them by Stillwell, M. & Co., they offered to dispose of one engine, four miles of steel rail which was laid, and sufficient of the live stock to reimburse Stillwell, M. & Co. for advances made by them ; that they knew they could dispose of said property or their rights therein for a sufficient amount to have liquidated said indebtedness to Stillwell, M. &. Co.; but that Stillwell refused to allow them the right under the mortgage to dispose of any of the property therein set out.    On various occasions in May, both the Petersons as well as Peacock stated to Deitsch that Stillwell had promised them in the office of Judge Adams that if they would sign the deed without causing them any further cost, Stillwell would take care of the indebtedness of Peacock, P. & Co., and led them to believe that in addition to the mortgage, Stillwell, M. & Co. would assume to settle, either in full or in compromise, the indebtedness of Peacock, P. & Co.    When Deitsch asked Stillwell, on May 2, regarding the above statement, he replied, " I did not promise to assume the

indebtedness, but I told them I would assist in getting a settlement." Deitsch asked if he meant to assist them financially, and he said, " No." All three of Peacock, P. & Co. stated to Deitsch and to the creditors in meeting that their main reason for signing the deed was, their impression that they would receive financial assistance to settle their indebtedness so as to get their name free. On May 4, Deitsch went to Verbena to see Peacock, P. & Co. and there did inform the two Petersons that the creditors were moving to get the property out of the hands of Stillwell, M. & Co., and that it would be to the interest of Peacock, P. & Co. not to surrender their property until they could go to Savannah and confer with their creditors; and upon the suggestion of W. M. Peterson Deitsch did make a few remarks to the laborers assembled, stating to them that the creditors were making an effort to help Peacock, P. & Co. out of their dilemma, and as they held labor liens which were prior to any others, they should not be uneasy, to which the laborers *en masse* replied, " We are willing to wait six months, if necessary." C. R. as well as W. M. Peterson stated to Deitsch at that time that in making the deed to Stillwell, M. & Co., they had included their sworn pay-roll which contained every dollar that was due to labor, but that in making the deal (deed ?) they had retained the books and accounts of Peacock, P. & Co., and that they intended to deduct from the several payments whatever was due to themselves from the laborers, and that while the pay-roll ostensibly amounted to $1,375, it would take only about $500 to pay said labor claims off. C. R. Peterson furnished Deitsch with a schedule of assets which, taking the estimates placed thereon by C. R. Peterson and putting them at a very low figure and valuation, amounted to about $38,000 ; and both the Petersons expressed their regret at having been inveigled into signing the deed, and were anxious

to have this action undone. W. M. Peterson telegraphed Peacock to come at once to Savannah in order to meet the creditors there and see if this action could be rescinded. On May 4, C. R. Peterson refused to surrender to the agent of Stillwell, M. & Co. the pay-roll which was in his possession, and any other property which had been deeded to that firm; and said agent left on the same train for Savannah with Deitsch, Peacock and Peterson. On the next day Peacock stated to Deitsch that he had learned that C. R. Peterson had been the recipient of $200 and W. M. Peterson the recipient of $400, as a consideration or *bonus* for signing the deed; and that to induce the Petersons to sign it, Stillwell, M. & Co. ostensibly gave both of them employment, both stating to Deitsch that they did not think this employment was *bona fide* but only temporary, and sooner or later they would be dismissed without cause. The statement in the evidence for Stillwell, M. & Co. that W. M. Peterson said to Deitsch that the property was conveyed to Stillwell, M. & Co. in settlement of their debt and that it was a fair trade and the matter was settled, is untrue. Peterson had been looking for employment in Savannah, and Deitsch simply told him that if he could aid him, or if the grocery company had any vacancy, he would do whatever he could for him; but he made no positive promise of any kind to Peterson, neither as to amount of salary nor as to time or kind of employment; and he certainly never stated to Peterson that Peacock, P. & Co. would be reinstated in the ownership of their property in ten days. The statements made by Hodgson in the testimony for Stillwell, M. & Co. are untrue. While some remarks may have been made by Deitsch as to his desire to see Peacock, P. & Co. reinstated, no such remarks as those attributed to him were ever made by him. He never instigated nor contrived anything; the only remarks he made to the

laborers were, that they held laborers' liens prior to any others, and that they need not be uneasy about getting their money. At Verbena Hodgson followed Deitsch wherever he went, listening intently and trying to make capital out of any remarks he might make, and various times asked him questions relating to the transaction of Stillwell, M. & Co. with Peacock, P. & Co., which he invariably refused to answer. The remarks attributed to him in the other affidavits for Stillwell, M. & Co. are untrue. He never said that the laborers had only to wait forty-eight hours, and that in that event the grocery company would furnish the money to pay them; he never told them that he would give them fifty cents a day extra, nor that Stillwell, M. & Co. had swindled Peacock, P. & Co. out of their property.

In addition to the answer already set out, which was sworn to by Stillwell, the testimony for Stillwell, M. & Co. tended to show the following : The firm of Peacock, P. & Co. was dissolved in writing on May 1, and since that date has not been engaged in trading or business. The Petersons entirely understood that the deed was absolute when they signed it; no duress, fraud or imposition was practiced upon any member of their firm so far as they know. W. M. Peterson was under the impression that the claim of the Hilton & Dodge Lumber Co. was to be arranged, but he sees now how he could have misunderstood Stillwell as to this, as Stillwell may have referred to any balance due on the timber for which they would be bound in any event if they wanted the timber. On May 4, Stillwell, M. & Co., through their agent Hodgson, were in complete possession of the property, and the Petersons on that day had, before the arrival of Deitsch, carried out the directions of Hodgson as agent. On May 2, they heard Deitsch ask Stillwell if he would cancel his deed upon the payment of the consideration. Stillwell replied that he could not

do it without consulting his partners. Deitsch made no tender, and after he left, Stillwell said that if the money was brought him he would accept it at once, that he would rather have the money than the property. W. M. Peterson next saw Deitsch on May 4 at Verbena and informed him of what Stillwell had said. Deitsch stated that he and the other creditors were going to pay up Stillwell, M. & Co. right away. When the deed was executed, Peacock, P. & Co. did not retain any interest in the property conveyed, but the deed was absolute, unconditional and *bona fide* in all respects, and was so understood by all the parties thereto before it was executed, nor was it made to hinder or delay the creditors. Stillwell, M. & Co. did not agree in any way to pay any of the debts due by Peacock, P. & Co., except only that they understood the amounts due the laborers, and claim of $100 due for feed, had to be paid as first liens ; and they also understood that the balance due on the mortgage of the bank and trust company was superior to their deed. They stated before the deed was made that they would much prefer to have their money, but as Peacock, P. & Co. were unable to pay, and they believed that it would be useless and expensive to have the mortgages foreclosed, they concluded it was best to make the deed. Afterwards negotiations between Stillwell, M. & Co. and the other creditors, looking to the payment by the latter to the former of a sufficient amount to make them whole, and to a reconveyance of the property, were, as the Petersons were informed, about to be consummated. They were greatly surprised at the bringing of the petition. All of the allegations in the affidavits for the petitioners which are in any wise contradictory of the averments of the answer are untrue. It is not true that the mortgages held by Stillwell, M. & Co. were given at the earnest demand of Stillwell. The advances made by them were at the earnest solici-

tation of Peacock, P. & Co.; and during the entire time of the making of such advances, mortgages were invariably required before the advances were made, and these mortgages were always promptly recorded. It is untrue that Stillwell stated when the mortgages were given that he would keep their creditors off; on the contrary he had no idea that any of the creditors were threatening them, but was informed by them that they would be able to meet every outside indebtedness without trouble. It is untrue that Stillwell promised to renew the notes from time to time as they fell due, indefinitely. He never at any time advised Peacock to go home and sell out his individual property, but when the matter was mentioned by Peacock he advised him to consult an attorney, and gave him no other advice or suggestion on the subject. It is not true that he went with Stillwell to the office of Judge Adams for the purpose of advising with reference to this matter, and that after getting there he was persuaded to sign the deed to the partnership property; on the contrary this deed was previously prepared and was read and discussed by Peacock and the two Petersons by themselves in private. They went to the office of Judge Adams for the purpose of executing it. While there Peacock did ask Judge Adams with reference to his individual property, and was advised that he had no right to make a deed of it to his son or to any one else unless it was *bona fide* upon a valuable consideration, and that his individual property was assets liable to the claims of his creditors just as much as partnership property. There was no suggestion or intimation on the part of Stillwell or his counsel to encourage Peacock in disposing of his individual property if he contemplated such a purpose. On two different occasions, May 19 and 20, Peacock stated to Stillwell that he knew that the deed was fair, honest and absolute, and that unless the creditors would pay

up Stillwell, M. & Co. and get a reconveyance of the property, he would not confer or negotiate further with them ; that this was the only thing that could be done or that he would aid in having done, and unless the creditors did this, he would have nothing further to do with them. On May 20 he stated to Stillwell in the presence of the Petersons and two others, "Yes, you have a fair and honest deed, and unless the other creditors pay you up there cannot be anything else done ; they cannot do anything but let you have the property." Since the appointment of the receiver, each of Peacock, P. & Co. has severally admitted that their claim of possession after they had signed the deed, was not made in good faith and was purely fictitious. If Deitsch has authority, without deriving it from the board of directors of the grocery company or without consulting them, to draw a check as vice-president for $13,265 or any like sum for the purchase of a saw-mill business of such proportions as that of Peacock, P. & Co., it is contrary to the understanding of Stillwell as a director of that company. On May 2, in the office of Stillwell, M. & Co., the employment of the Petersons was discussed and arranged. They stated that they were more familiar with the property and the business than any one else, and could be of as much service as any one who could be sent there ; and it was agreed that they should be employed as stated in the answer, both of them to work under Hodgson's direction. On May 4, they delivered to Hodgson possession of all the property and went faithfully to work under him, doing whatever was assigned to them by him. They stated to the men about the mill that they no longer owned the property and had sold it to Stillwell, M. & Co., whose representative Hodgson was and to whom they must look for directions. Everything proceeded harmoniously and pleasantly until the arrival of Deitsch about two o'clock in

the afternoon. He had protracted conversations with the Petersons and the men about the mill, telling W. M. Peterson that he would back Peacock, P. & Co. with $50,000 if necessary, if they would fight Stillwell, M. & Co. and try to break the deed. At first Peterson was not disposed to accept his offer, and said, "I don't want to do anything of the kind. We have conveyed our property to Stillwell, Millen & Co. in settlement of our debts. It is a fair trade, and the matter is settled." Deitsch told him that he (Deitsch) would reinstate him in the ownership of the property within ten days, and would let him have all the money he wanted to run it; that he should not lose anything; and that if they failed to break the deed and had to give up the property, Deitsch would employ him at a salary of $100 per month. Peterson then said that he and his partners would make the fight to undo the deed if Deitsch thought there was a chance to do it and would furnish the money. They went into the office where Deitsch said, in substance: "We don't care about our debt, but what we desire is to help these young men [the Petersons] and put them on their feet again. We propose to pay off Stillwell, Millen & Co.; it is as easy for us to raise thirteen or fifteen thousand dollars as it is to sell fifty dollars worth of goods; and within forty-eight hours we will pay off the laborers and have Peacock, Peterson & Co. reinstated in the ownership of the property." About $1,800 forwarded by Stillwell, Millen & Co. to pay off the laborers arrived that afternoon, and Hodgson announced to them this fact; but W. M. Peterson had become dissatisfied, and Hodgson, by reason of the instigation and contrivances of Deitsch, was prevented from getting the pay-roll, and the laborers were induced and persuaded by Deitsch to decline to receive any money from Stillwell, M. & Co. He called them together, causing a general suspension of work, and told

them that if they would wait only forty-eight hours, the Savannah Grocery Co. would furnish them the money to pay them every cent duo them, and in addition would pay them fifty cents a day for every day they had to wait; that it would be an act of unfriendliness towards Peacock, P. & Co., who were their friends and late employers, to accept payment from Stillwell, M. & Co., and they ought to stick to Peacock, P. & Co. and thus aid them to protect themselves against the fraud and rascality of Stillwell, M. & Co., who had swindled them out of their property; that the grocery company did not care anything about the $1,000 due it; that he only desired to help out Peacock, P. & Co. ; and that he had no interest in helping the laborers except to see them get their rights, etc.   On leaving for Savannah that night, Hodgson left C. R. Peterson in charge who continued to act for Stillwell, M. & Co. until May 6, when Hodgson resumed possession and control and subsequently turned over the same to one of the firm of Stillwell, M. & Co., who remained in possession until the receiver took possession on May 11, the employees having in the meantime been paid by Stillwell, M. & Co. The values given to the property in the testimony for the petitioners are excessive, and are given without taking into account the liens and liabilities against the property.   The bulk of the timber is not paid for ; the timber is not worth the amount that would have to be paid on it; and for what is due on it a larger amount of timber just as valuable and desirable could be purchased.   To land valued in the testimony for the petitioners at $12,000 Peacock, P. & Co. have only a bond for title on which they have paid only $3,000, and Stillwell, M. & Co. would not give for the place the $9,000 due on it, and in fact do not expect to take it; and it is only a nominal asset.   Other land valued at $4,300 is not worth over $1,500 ; and its value would be merely

nominal were the mill removed. On the four miles of steel rails valued at $6,000 about $3,200 is due. On the tram locomotive is due for purchase money and freight $3,558; and on the rest of the machinery are due various amounts. On the locomotive valued at $4,000 is due $2,900 purchase money which must be paid if the locomotive is kept, the title having been retained by the vendor to secure the purchase money. Upon a fair and just estimate the aggregate value of the property included in the deed is $28,653, from which is to be deducted $9,658 and $2,000 due the Hawkinsville Bank & Trust Co., besides various amounts due for purchase money and other claims and liens the character and amounts of which are unknown, but which will amount to several thousand dollars; and upon the most favorable estimate the value of the property is less than the consideration of the deed. This estimate is on the basis of real value; if the property were put up for sale it would not bring nearly so much, and could not possibly bring anything like the amount of the indebtedness of Peacock, P. & Co. to Stillwell, M. & Co.

The deed and mortgages in question were in evidence, and the statements in the pleadings as to them will suffice for this report.

The judge granted the injunction prayed for, and appointed a permanent receiver of the estate of Peacock, P. & Co. and of each of the members of that firm, and ordered him at his earliest convenience to reduce the property to money by sale of the same at either public or private sale as might seem to him to the best interest of all parties concerned, etc. Stillwell, M. & Co. excepted, because each of the orders was contrary to law and evidence; because the judge had no jurisdiction to grant either of them; because the evidence did not authorize the grant of either of them; because petitioners were not lien or judgment credi-

tors and were not asserting any claim to title; because
Peacock, P. & Co. were not traders when the petition
was filed; because petitioners had an adequate remedy
by attachment; because it was not alleged that Still-
well, M. & Co. were insolvent but the contrary appeared;
and because no necessity for injunction and receiver was
shown.

DENMARK, ADAMS & ADAMS, A. C. WRIGHT and PATE
& WARREN, for plaintiffs in error.

GARRARD & MELDRIM, SMITH & CLEMENTS, W. L. CLARKE
and R. R. NORMAN, *contra.*

BLECKLEY, Chief Justice.

The facts are stated in the official report. The judg-
ment below was acquiesced in by the debtors, Peacock,
Peterson & Co., the excepting parties being Stillwell,
Millen & Co. alone. In so far, therefore, as the granting
of an injunction and the appointment of a receiver con-
cern any property not conveyed by the former of these
firms to the latter, the decision of the presiding judge,
whether correct or incorrect, should not and could not
be disturbed on this writ of error. What we shall rule
will have relation only to the property embraced in the
conveyance to which we have referred, leaving the in-
dividual property of the several persons composing the
firm of Peacock, Peterson & Co., to be dealt with by
the receiver as though it alone had been the subject-
matter of the receivership.

1. The petitioning creditors attack this conveyance
as fraudulent. Giving the petition the widest possible
range, it has three aspects. It rests, first, upon the in-
solvent traders' act (Code, §3149a *et seq.*); secondly,
upon the assignment act of 1881 (Acts 1880–81, p. 174,
Code Addenda, §1953d p. x), as amended by the act of
1885 (Acts 1884–5, p. 100); and thirdly, upon the gen-
eral law making void all conveyances intended to

hinder, delay or defraud creditors.   If the evidence supports any one of these aspects of the petition, it is the last one.   It does not support the first, because the partnership of Peacock, Peterson & Co. had been dissolved and had ceased to carry on the firm business before the petition was filed.   In this respect the case is within the ruling on that subject in *Kimbrell* v. *Walters*, 86 *Ga.* 99, and previous cases therein cited.   The evidence does not support the second aspect of the petition, because it shows, not an assignment, but an absolute conveyance made in payment of a pre-existing debt together with an undertaking by the purchasers, Stillwell, Millen & Co., to pay certain other debts, not out of the proceeds of the property, but absolutely as a part of the agreed price.   Touching this element, the case is ruled by *Powell* v. *Kelly*, 82 *Ga.* 1.   By a very decided preponderance of the evidence, the conveyance was made free from any trust, open or secret, in favor of the debtors or any creditor or any other person.   It was an absolute and unconditional sale, and the only element of suspicion attaching to it results from apparent inadequacy of price.   There is no doubt that the property covered by the conveyance, estimated at its normal value, was very much in excess of the purchasing creditors' debt and of the whole consideration expressed in the conveyance.   Various facts are set up by Stillwell, Millen & Co. to account for and vindicate the transaction notwithstanding this excess, the principal fact being that much of the property embraced in the deed had not been paid for by Peacock, Peterson & Co., and was still subject to claims for its own purchase money.   Conceding all the consequences that could be drawn from the excess of value over the price paid, the case is that of a conveyance by an insolvent partnership to one of the firm creditors at an undervaluation, made to hinder, delay or defeat the other firm creditors.   What, then,

is the rule of law governing the grant of injunction and the appointment of a receiver as against such purchasing creditor, the attacking creditors being without judgments or other liens, and claiming no title to the property either by reason of fraud in procuring credit therefor in the creation of their demands or otherwise? There can be no doubt that, generally, creditors complaining of a fraudulent conveyance of his property by their debtor are not entitled to an interlocutory injunction and receiver. The present case falls within this general rule, inasmuch as there is no allegation of the insolvency of the alleged fraudulent purchasers, Stillwell, Millen & Co. The case of *Mayer* v. *Wood*, 56 *Ga.* 427, is a direct authority upon the subject, so far as an injunction is concerned; and the principle of that case fairly carried out will extend also to the element of appointing a receiver. Where injunction to restrain a solvent purchaser from disposing of the property embraced in his fraudulent purchase would not be granted, we can see no reason why a receiver should be appointed. That the solvency of the purchaser would be security against ultimate loss by the attacking creditors in case they should establish their debts and prove the fraud, would stand as well for a reason against appointing an *ad interim* receiver as against granting an injunction. It is obvious that merely to enjoin a man temporarily from disposing of property to which he claims title is a milder interference with his dominion over it than to take it from him and put it in the hands of a receiver. Indeed, before the order granting an injunction in *Mayer* v. *Wood* was brought to this court for review, it had been so far modified, with consent of the parties, as to allow the fraudulent purchasers to sell the goods and hold up the proceeds, thus virtually converting them into receivers for that purpose. Nevertheless, the order itself, after this modification, was held erroneous.

Tested by the case cited and by the main current of the authorities, we are of opinion that no receiver for the property purchased by Stillwell, Millen & Co. should have been appointed. And we are clear that the discretion of the judge was not well exercised in appointing such receiver absolutely and unconditionally, without offering Stillwell, Millen & Co. the alternative of giving bond and security either for the forthcoming of the property, or for the eventual condemnation money in this cause. The property consisted partly of real estate, which could not disappear, partly of a saw-mill and fixtures, and partly of a large number of animals used in connection therewith. These animals would be expensive to keep in the hands of a receiver. They would have to be sold speedily, or else the receiver would have to operate the saw-mill at a heavy daily expense, and under many hazards of loss. In the exercise of a wise judicial discretion, it could not be otherwise than desirable, in behalf of the interest of all parties concerned, to keep such property out of the hands of a receiver; and if that could be done by exacting bond and security, this exaction ought to have been made, and opportunity afforded to comply with it. In *Cohen* v. *Meyers*, 42 *Ga.* 46, the receiver was appointed *ex parte*, but on hearing the matter after answer, the chancellor recognized as a basis for discharging the receiver the alternative of giving bond and security for the payment of any recovery which might be had in the case. It may be asserted as a general proposition that a bond with good security is always a better form of protecting creditors likely to be injured by fraud than the appointment of a receiver for property perishable in its nature or expensive to keep. And in most cases the liability of a solvent party without bond and security would itself be preferable to an expensive receivership. The answer of Stillwell, Millen & Co.

alleged that they were solvent and fully able to respond. This was not contradicted by any evidence or by any allegation in the petition. By no disposition or misappropriation of the property pending suit against them to set the conveyance aside could they evade their responsibility to the plaintiffs for any fraud complained of in the petition, should that fraud be established at the final trial of the cause. Being solvent, they are virtually sureties to the petitioning creditors for the forthcoming of the property should the conveyance be set aside, or for its value in excess of their own debt and the residue of the price at which they purchased it.

2. It developed in argument at the bar that the case of *DeLacy* v. *Hurst*, 83 *Ga.* 223, was susceptible of being misunderstood by learned counsel. That case holds that in one and the same suit creditors may proceed for judgment on their debts, and to set aside fraudulent conveyances ; but it nowhere suggests that an *ad interim* injunction or receiver can be had in any case in which the like extraordinary remedy could not be invoked prior to the passage of the uniformity procedure act of 1887. On the contrary, in the statement of facts with which the opinion in that case opens, it is said : " The trial judge refused to grant the injunction or to appoint a receiver." This refusal was acquiesced in, and consequently the element of injunction and receiver had been eliminated from the case before it reached this court. We adhere to the decision in *DeLacy* v. *Hurst*, but cannot apply it to this case at its present stage further than to hold that the creditors attacking this conveyance are *recti in curia* as to the ultimate purposes of their action, these purposes being to establish their claims against Peacock, Peterson & Co. and set aside an alleged fraudulent conveyance made by them to their codefendants, Stillwell, Millen & Co.

The judge erred in granting an injunction as to Still-

well, Millen & Co.; in appointing a receiver for the prop-
erty embraced in the conveyance to them, and in order-
ing a sale of that property by the. receiver.

*Judgment reversed.*